UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| BRINK'S CAPITAL, LLC,<br><br>Plaintiff,<br><br>v.<br><br>JOE RANDAZZO'S FRUIT AND VEGETABLE, INC.,<br><br>Defendant. | Case No. 24-cv-11570<br><br>Honorable Robert J. White |

**OPINION AND ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, (2) DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND (3) DENYING PLAINTIFF'S MOTION IN LIMINE AS MOOT WITH LEAVE TO REFILE**

This case commenced with the parties' competing breach-of-contract and related claims against one another, arising from Plaintiff's supply of a type of automated safe and provision of cash management services for Defendant's commercial locations. On July 23, 2025, the Court denied Plaintiff's motion to dismiss Defendant's counterclaims as moot, reasoning that Defendant failed to assert these claims in its operative pleading. (ECF No. 43). Before the Court are the parties'

competing motions for summary judgment. (ECF Nos. 28-29).[1, 2] The Parties fully briefed Plaintiff's motion, but Defendant never replied to Plaintiff's response to Defendant's motion. The Court will decide the motions without oral argument pursuant to Local Rule 7.1(f)(2).

For the following reasons, the Court (1) grants in part and denies in part Plaintiff's motion for summary judgment and (2) denies Defendant's motion for summary judgment. Specifically, the Court concludes as a matter of law that Defendant (1) is bound by the contract at issue and (2) breached the contract's terms by unilaterally terminating the contract without providing Plaintiff the opportunity to cure. The Court also rejects Defendant's defenses with respect to substantial compliance, first material breach, and liquidated damages. And having rejected Defendant's challenge to the contract's liquidated damages provision, the Court concludes that Plaintiff has established an unrebutted prima facie case with respect

[1] Plaintiff also filed a motion in limine on September 8, 2025, to exclude certain statements and evidence from trial. (ECF No. 51). Plaintiff stated, however, that this motion was "filed out of an abundance of caution in case the Court determines that the trial of this matter will be a jury trial." (ECF No. 51, PageID.2046); *see also id.* ("A Motion in Limine will be unnecessary if the trial is not a jury trial."). The Court later ordered that "any trial in this case will be a bench trial." (ECF No. 55, PageID.2140). Accordingly, Plaintiff's motion in limine is denied as moot, without prejudice and with leave to refile if warranted following entry of this opinion and order.

[2] The portion of Plaintiff's summary judgment motion seeking dismissal of Defendant's counterclaims is also denied as moot because, as stated, the Court already determined that Defendant failed to properly plead any counterclaims in its operative answer.

to the element of damages. In contrast, the Court concludes that a genuine factual dispute exists concerning whether the contract is voidable due to material misrepresentations that induced Defendant to enter into the agreement.

## I. Background

Plaintiff "provides and services cash management-related equipment to retailers throughout the U.S." Defendant operates grocery stores and nurseries at five locations in metro-Detroit. (ECF No. 29, PageID.624; ECF No. 45-1, PageID.1535). Defendant previously contracted in 2017 for Brink's U.S.[3] to provide and service its "compusafes" at Defendant's stores. Under the earlier agreement, safe deposits were periodically picked up via armored vehicle, with Defendant receiving funds only after deposits were picked up and processed. This agreement expired in 2022. (*See generally* ECF No. 29-3, ECF No. 29-4; *see also* ECF No. 29-13, PageID.789, 795-96, 812).

This case primarily concerns the purported written agreement between the parties, executed on October 5, 2022, for Plaintiff to provide Defendant a newer product, "Brink's Complete Solution" (Brink's Complete), which gave retailers

[3] Brink's U.S. and Plaintiff Brink's Capital, LLC, although technically separate entities, both operate as wholly-owned subsidiaries under the same parent company, Brink's, Inc. *See* Brink's U.S. Website, *Corporate Overview* <https://us.brinks.com/corporate /overview> (accessed May 12, 2026); S.E.C., *Subsidiaries of the Brink's Co.*, Dec. 31, 2020 <https://www.sec.gov/Archives /edgar/data/78890/000007889021000014/ a202010-kexhibit21.htm> (accessed May 12, 2026).

earlier access to deposited funds via electronic money transfer. (*See* ECF No. 29-6, PageID.710; ECF No. 29-13, PageID.798-800, 814-15; s*ee generally* ECF No. 29-4). Specifically, Plaintiff, per the written contract, agreed to install and service its "smart safe" at Defendant's locations. The contract also includes a "Direct Credit" service, stating that Plaintiff "is agreeing to advance credit to Customer" upon request, subject to certain terms. (ECF No. 29-6, PageID.710-12, 717-19). As relevant here, the contract was signed by Cindy Kole, Defendant's controller. (ECF No. 29-6, PageID.710; *see also* ECF No. 29-13, PageID.783-84).

Plaintiff asserts claims of breach of contract and breach of the implied covenant of good faith and fair dealing, alleging that Defendant (1) unilaterally terminated the parties' agreement contrary to its terms, (2) failed to pay Plaintiff the requisite liquidated damages, and (3) acted in bad faith for the improper purpose of attempting to manufacture a basis for termination—specifically, by preventing Plaintiff's efforts to cure issues with the equipment at Defendant's stores. (ECF No. 14). Both parties now move for summary judgment in their favor on Plaintiff's breach of contract claim. (ECF Nos. 28-29).

According to Plaintiff, there is no genuine dispute that Defendant failed to follow the process governing early termination in the parties' written agreement and committed a breach by not allowing Plaintiff to cure defective equipment before

Defendant unilaterally terminated the agreement, thus triggering the contract's liquidated damages provision. (ECF No. 29, PageID.635-41).

Defendant counters in relevant part that the written contract is unenforceable either because (1) it was never signed by someone with authority to bind Defendant or (2) Plaintiff made fraudulent misrepresentations to induce Defendant's assent. (ECF No. 45, PageID.1530; ECF No. 45-1, PageID.1541-49, 1561-62). Defendant alternatively argues that even if the written contract is enforceable, Plaintiff committed the first material breach. (ECF No. 45, PageID.1531; ECF No. 45-1, PageID.1541-42, 1553-55, 1562-63).[4] Defendant argues further that the written contract's liquidated damages provision is unenforceable under Delaware law. (ECF No. 45, PageID.1530; ECF No. 45-1, PageID.1549-52).

Defendant also asserts that it substantially complied with the written contract's provisions by giving Plaintiff more than 30 days to cure equipment issues after providing notice that the safes were defective. (ECF No. 45-1, PageID.1558-60). And Defendant argues that "[the] instant case has many . . . factual issues" "involving a party's state of mind, motive, and intent [that] are not appropriate for Summary Judgment." (ECF No. 45-1, PageID.1561). Defendant specifically states that the issue of "agency" (i.e., whether Defendant's controller who signed the

[4] While portions of these arguments are framed in the context of Defendant's crossclaims that no longer exist in this case, they remain relevant as possible defenses to Plaintiff's breach of contract claim.

written contract had actual or apparent authority to bind Defendant) presents a disputed question of fact that cannot be resolved at this stage. (ECF No. 45-1, PageID.1561-62).

Defendant's own motion for summary judgment relatedly argues there is no genuine dispute that either (1) Plaintiff committed the first material breach or, alternatively, (2) the written agreement was never signed by someone with authority to bind Defendant.[5] (ECF No. 28-2, PageID.232-46). Plaintiff counters that it attempted to cure any defects in the equipment as contemplated by the parties' contract and never breached the terms thereof, and it reiterates that Defendant breached the agreement by not allowing Plaintiff to cure defective equipment before Defendant's unilateral termination. (ECF No. 46, PageID.1665-70). Plaintiff also argues that Defendant's controller had either actual or apparent authority to bind Defendant, with the facts here so one-sided that no reasonable fact-finder could ever conclude that such authority was lacking. And Plaintiff notes that Defendant's claim otherwise was only raised years after the contract was signed and after this action commenced. (ECF No. 46, PageID.1671-75).

---

[5] This latter contention notably conflicts with Defendant's argument in response to Plaintiff's motion for summary judgment that this "agency" issue presents a factual dispute that cannot be resolved at this stage. Specifically, if the agency issue presents a genuine dispute with the facts construed in Defendant's favor, the Court cannot see how identical facts construed *against* Defendant would definitively resolve the same issue and warrant summary judgment for Defendant.

## II. Legal Standard

A party may move for summary judgment on any claim or defense. Fed. R. Civ. P. 56(a). The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* In analyzing a summary judgment motion, "'the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.'" *U.S. S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (quoting *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)).

"'[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" *Sierra Brokerage*, 712 F.3d at 327 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. Overall, the court's inquiry turns on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

## III. Analysis

The parties agree that if the written contract is enforceable, Delaware law applies. "Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff." *Holzbaur v. Trolley Square Hosp., LLC*, 340 A.3d 603, 610 (Del. Ch. 2025). The Court therefore begins with whether the written agreement at issue (the Brink's Complete agreement) constitutes a valid, enforceable contract under Delaware law.

### A. Validity/Enforceability of the Written Contract

Pursuant to Delaware Law, "a valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration." *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1212-13 (Del. 2018). At issue here is Defendant's intent to be bound. Further, because a contract may be voidable due to fraudulent misrepresentation, this provides an affirmative defense in an action for breach of contract. *Alabi v. DHL Airways, Inc.*, 583 A.2d 1358, 1361 (Del. Super. 1990). These matters are addressed in turn.

#### 1. Agent's Authority and Defendant's Intent to be Bound

As discussed, Defendant argues that Kole, Defendant's controller who signed the Brink's Complete agreement, lacked authority to bind Defendant. Because

Defendant is an artificial corporate entity, it "can act only through its agents." *Caribbean Sun Airlines Inc. v. Halevi Enters. LLC*, 339 A.3d 24, 35 (Del. 2025). "An agent's actions or representations to a third party bind a principal only if the agent has legally recognized authority to take such action or make such representations." *Id.* An agent's authority may be actual or apparent. *Id.*

> An agent possesses "actual authority" when it has been expressly or implicitly granted authority by a principal. "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act."
>
> By contrast, apparent authority "is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." This authority is not actually granted by the principal. Instead, it originates when the principal knowingly or negligently permits an agent or other actor to exercise such authority or holds out an agent or other actor as possessing such authority. If a third party relies on this apparent authority in good faith and is "justified in doing so by the surrounding circumstances," the principal is bound to the same extent as if actual authority existed. "When dealing with apparent authority, the emphasis shifts to third party reliance on the acts of the principal and the agent as opposed to any express or implied grant by the principal." It bears emphasizing that "apparent authority can never be derived from the acts of the agent alone." A third party must use "ordinary prudence and reasonable diligence" in ascertaining the scope of the agent's authority and will not be permitted to enforce an agreement under a theory of apparent authority if it "ignores facts illustrating the agent's lack of authority."
>
> In short, to find that a principal is bound under a theory of apparent authority we must find that "(1) the third party reasonably

> believes that the [agent] has such authority; and (2) that belief is traceable to the [principal's] manifestations."

*Id.* at 35-36 (citations omitted; alterations in original).

Defendant argues that Kole's signature does not bind it to the written contract because she was not an officer for Defendant, Sam Randazzo was Defendant's only "control person" authorized to enter contracts, Plaintiff knew Randazzo was the sole control person, and Randazzo was never aware of the contract at issue, never agreed to the contract or gave Kole the authority to do so, and never himself communicated with Plaintiff. Concerning apparent authority in particular, Defendant argues that (1) Plaintiff's knowledge that Randazzo was Defendant's sole control person nullifies any reasonable belief that Kole had authority to bind Defendant and (2) Plaintiff cannot rely on Kole's representations in this case where Plaintiff, the principal, never made any manifestation of Kole's authority. (ECF No. 28-1, PageID.220-22; ECF No. 28-2, PageID.242-45; ECF No. 45-1, PageID.1535-36, 1541, 1561-62).

Beginning with the applicable facts, Kole testified that her work involves accounting, financials, and other "general office duties." (ECF No. 29-13, PageID.784; *see also* ECF No. 28-5). She also affirmed handling, with respect to Plaintiff's services, all "dealings relating to the contract or issues with the equipment." (ECF No. 29-13, PageID.794). And Kole affirmed signing, by

electronic means, the written contract for Brink's Complete at issue here. (ECF No. 29-13, PageID.797-98).

Next, Kole discussed numerous emails she exchanged just before signing the contract. (ECF No. 29-13, PageID.798-800). As relevant here, a sales representative for Plaintiff emailed Kole on September 29, 2022, asking whether he should move forward and register Defendant for Brink's Complete. Kole responded, "I will know by the end of day. I have checked with 3 of the 4 owners and it is go with them [sic]. I just have to confirm with the 4th owner . . . ." She later followed up that "the fourth owner . . . is on[ ]board." (ECF No. 29-5, PageID.696-98).

Kole testified that the fourth owner referenced in her email was Randazzo. (ECF No. 29-13, PageID.800). Asked whether all the owners were "in agreement to you moving forward with the Brink's Complete Service Agreement," Kole said, "They did like the pricing." (ECF No. 29-13, PageID.800; *see also* ECF No. 29-13, PageID.895). This colloquy followed:

> [Plaintiff's Counsel:] . . . when you sent this email, was it your understanding you had permission from the owners to move forward with the Brink's Complete Service Agreement?
>
> [Kole:] For me, it was I had approval on the pricing. However, I don't really have signing privileges. And, so, I'm not sure why it was positioned to come to me.
>
> [Plaintiff's Counsel:] Okay. Did you ever tell anyone at Brink's that you did not have signing privileges?

> [Kole:] No. But[] they did state they needed [a] driver's license and [a] signer on the bank account, which I did not supply a driver's license nor was I a signer on the bank account. Therefore, to me, I didn't have the authority to sign the agreement.
>
> [Plaintiff's Counsel:] Okay. Then[] why did you sign the agreement?
>
> [Kole:] Because we were going through electronic registration and I thought this was part of the electronic registration to get things moving forward.

(ECF No. 29-13, PageID.801; *see also* ECF No. 29-13, PageID.880-81, 885, 895).

Kole testified that Randazzo later "talked to" her about his disappointment with the agreement, and she was told for the first time in January 2023 that she did not have authority to sign the contract. (ECF No. 29-13, PageID.802-03). She could not recall whether she ever relayed this information to Plaintiff, however, and conceded that such disclosure would have occurred at the earliest in January 2023. But Kole reiterated, "With the E-registration I just thought I was agreeing to the pricing . . . ." (ECF No. 29-13, PageID.803, 895-96).

Kole relatedly testified to her belief that Randazzo, as Defendant's president, was the only individual who could approve and authorize the contract at issue, and that she ultimately signed the contract without any express or implied authorization to do so. And Kole stated that, to her knowledge, Randazzo never saw the contract before she signed it. Kole "d[id not] believe" she ever represented herself to Plaintiff as Defendant's authorized agent, and she ultimately could not recall any discussion

with Plaintiff regarding whether she had authority to bind Defendant. (ECF No. 29-13, PageID.881-82, 896-97). Further, Kole testified that Defendant in November 2022 required an officer's signature with respect to an application for check processing.[6] (ECF No. 29-13, PageID.883-85).

Kole also acknowledged signing an addendum to the Brink's Complete contract on November 2, 2022, stating she believed she had authority to do so at the time. (ECF No. 29-13, PageID.807-08; *see also* ECF No. 29-7). Kole similarly acknowledged signing an agreement on December 27, 2022, with Loomis Armored U.S., LLC, a different cash management company (the Loomis contract). (ECF No. 29-13, PageID.784-88, 820-21; *see also* ECF No. 46-3). According to Kole, Randazzo gave her verbal permission to sign in this instance.[7] (ECF No. 29-13, PageID.801-04). And discussing the prior 2017 agreement between Brink's U.S. and Defendant, Kole admitted that it was signed by Defendant's previous controller. (ECF No. 29-13, PageID.788-89, 791-92; *see also* ECF No. 29-3). Kole stated that she and the prior controller shared similar duties, but with one difference being that

---

[6] Although not wholly clear from her testimony, it appears this requirement reinforced Kole's belief that she lacked authority to execute the Brink's Complete agreement on Defendant's behalf.

[7] During cross-examination with defense counsel, Kole testified that she lacked authority to enter into *any* contracts on Defendant's behalf. (ECF No. 29-13, PageID.878-80). She later clarified, however, that the Loomis contract was an exception, reiterating that Randazzo gave her authority to bind Defendant in this one instance. (ECF No. 29-13, PageID.885-86).

the other controller "had check signing privileges." (ECF No. 29-13, PageID.792-93).

Kole testified further that she was the point person handling communications with Plaintiff in this matter, and she was unaware of anyone else ever communicating with Plaintiff on Defendant's behalf. (ECF No. 29-13, PageID.810-12). She was also unaware of ever signing any agreement during her work for Defendant other than those already mentioned. (ECF No. 29-13, PageID.843).

Randazzo first testified that he never spoke with anyone working for Plaintiff or Brink's U.S., and he did not closely follow "what's going on with the safes and money deposits" at Defendant's locations. (ECF No. 29-14, PageID.926-27; *see also* ECF No. 28-6). He said Kole primarily communicated with Plaintiff, and he was unaware of any other employee ever doing so. (ECF No. 29-14, PageID.928-29). However, Randazzo stated that he and Kole spoke "daily" about problems with Defendant's equipment after it was installed. (ECF No. 29-14, PageID.928).

Randazzo stated he was aware that Plaintiff began installing safes at Defendant's locations in December 2022, with the new safes meant to replace the "Compusafes" from Brink's U.S. that Defendant used prior. (ECF No. 29-14, PageID.937-38). Asked about the Brink's Complete contract specifically, however, Randazzo said he "didn't even realize there was a contract." (ECF No. 29-14, PageID.938). According to Randazzo, he discussed the details of the Brink's

Complete service generally with Kole, and he only understood that it was similar to the service they already used but with better pricing and "more efficien[cy] in the way that we would get our credit quicker [sic]." (ECF No. 29-14, PageID.938-40).

Next, Randazzo testified that he first told Kole she lacked authority to sign the Brink's Complete agreement "[p]robably when I found out we were getting sued." (ECF No. 29-14, PageID.940-42, 963). Randazzo reiterated that he initially did not realize Kole had signed a contract and affirmed that he was "not really aware" of a contract dispute until Defendant was served in this case. (ECF No. 29-14, PageID.942). Randazzo emphasized that he never intended any of his conversations with Kole about the Brink's Complete service to give her authority to enter into any agreement with Plaintiff, particularly when he "didn't even know there was a contract." (ECF No. 29-14, PageID.942-44). According to Randazzo, Kole "didn't have signing authority for anything." (ECF No. 29-14, PageID.966).

Randazzo confirmed giving Kole his driver's license around when she signed the written agreement, which Plaintiff apparently needed to move forward with enrolling Defendant in the Brink's Complete service, but Randazzo did not remember the specific instance and said Kole would regularly need his license "for quite a few different things." (ECF No. 29-14, PageID.945). He likewise did not specifically recall providing or approving the submission of his or other owners' information to Plaintiff. (ECF No. 29-14, PageID.948-50).

Randazzo relatedly testified that he never gave Kole authority to sign, or even discussed with her, any subsequent addendum or amendment to the Brink's Complete agreement. (ECF No. 29-14, PageID.946-48). Regarding the Loomis contract, Randazzo testified that he gave Kole verbal permission to sign only after Defendant's attorney reviewed the agreement and discussed it with him. (ECF No. 29-14, PageID.930-31, 961, 967-68). Asked whether he similarly gave Defendant's prior controller permission to sign the 2017 contract with Brink's U.S., Randazzo did not recall the particulars but said the prior controller "was with us for over 30 years" and had "permission to sign just about anything." (ECF No. 29-14, PageID.934-35). He also testified that the prior controller, unlike Kole, was a certified public accountant. (ECF No. 29-14, PageID.961-62).

Also relevant to Kole's authority (or lack thereof) in this case, she submitted company information to Plaintiff in October 2022 that identified Randazzo as the "Control Person" for Defendant. (ECF No. 28-10, PageID.560-61; ECF No. 29-14, PageID.964). According to Randazzo, this document put Plaintiff on notice that he, not Kole, was "the control person in charge of the corporation[.]" (ECF No. 29-14, PageID.964-65). And Randazzo noted that he never signed any document with Plaintiff, nor did any other officer or director for Defendant. (ECF No. 29-14, PageID.965).

Marie Randazzo Urbani, Defendant's secretary and Randazzo's sister, relatedly testified that she believed Randazzo "mostly" had authority to sign contracts for Defendant. She could not recall ever signing anything herself and was unsure if any other officer other that Randazzo had done so. (ECF No. 29-18, PageID.992-95, 1000). During cross-examination, she said only Randazzo could have given Kole authorization in this case. (ECF No. 29-18, PageID.1011-12).

Urbani also testified that Kole knew "she was not a signer on the [bank] account" and "had to come to . . . a corporate officer [for them] to sign [checks and other documents]." According to Urbani, although not explicitly discussed, the fact that Kole similarly lacked authority to enter contracts on Defendant's behalf "was just a given" that Kole "would have" and "should have known." (ECF No. 29-18, PageID.1000). Like Randazzo, Urbani testified that she discussed with Kole pricing and other general aspects of the Brink's Complete service but never saw or approved the specific agreement at issue. (ECF No. 29-18, PageID.1002-03).

Joseph Masotti, Plaintiff's sales representative who communicated with Kole concerning the Brink's Complete service, testified to his belief, based on Kole's emails, that she had authority from Defendant's four owners to enter into the Brink's Complete agreement. (ECF No. 28-7, PageID.476-81, 483-84). And Masotti said, "a lot of our contracts are signed by controllers." (ECF No. 28-7, PageID.485).

Masotti also testified that there are no specific steps he takes to ensure a particular person has authority to bind a principal, but he said:

> We do ask who is going to sign the contract, I've done that lots of times, but if someone says they're a controller and they will be the one to sign the contract, we let them sign the contract.

(ECF No. 28-7, PageID.488). Masotti then reiterated his understanding from Kole's emails that she had permission from the owners to "[m]ove forward with the agreement and the contract," not mere acceptance on pricing or to engage in further negotiations. (ECF No. 28-7, PageID.489-90). But Masotti confirmed taking no affirmative action outside his reliance on Kole's emails to independently confirm she had authority to bind Defendant. (ECF No. 28-7, PageID.490).

Discussing the company information Kole submitted, Masotti acknowledged that it identified Randazzo as Defendant's "control person." But Masotti said this would not change his understanding of Kole's authority "[b]ecause [she] is the controller, and we have lots of controllers that sign our agreements." (ECF No. 28-7, PageID.492-503). According to Masotti, he "personally wouldn't be concerned with who [Defendant] chooses to have sign." He "trust[ed] that the person that [Defendant] ha[d] signing ha[d] authority to sign contracts." (ECF No. 46-4, PageID.1997).[8]

---

[8] These statements come from Masotti's deposition corrections attached to Plaintiff's response brief. (*See* ECF No. 46-4). At the deposition, Defendant's counsel asked

Relatedly, a declaration from Rachel Moon, Plaintiff's vice president and chief compliance officer, states that Kole identified herself as the "signatory" in Plaintiff's online system. According to Moon, once a customer enters the required information, the system automatically generates a contract to be signed by the customer's stated signatory, in this case Kole. (ECF No. 46-2, PageID.1680-82).

Kole, Randazzo, and Urbani all testified that there were immediate problems with Plaintiff's safes upon installation in December 2022.[9] (ECF Nos. 29-13, PageID.816-17, 819-20, 843-54, 858-60, 866-77; 29-14, PageID.928, 931-32, 945-46, 954; 29-18, PageID.996-97, 1004-05, 1012; *see also* ECF Nos. 28-4, PageID.259-65; 28-9, PageID.550-51). Email communications show that Kole initially reached out to Plaintiff's representatives on December 9, 2022, requesting service for two safes installed at Defendant's stores (stores #200 and #600) and to postpone installation of safes at Defendant's two remaining stores given the outstanding problems. Technicians came to address the issues at both stores on December 14, 2022. (ECF No. 29-8, PageID.726-48).

---

whether Masotti would be "concerned that it was Sam Randazzo that had authority and not Cindy Kole to enter into this contract[.]" Masotti initially responded that he "wouldn't be personally concerned" "[b]ecause the person that signed the contract was a controller for [Defendant]." (ECF No. 28-7, PageID.497-98).

[9] One safe was installed on November 15, 2022, at one of Defendant's seasonal locations, but Kole said the safe's performance was never tested since the store was closed at the time. (ECF No. 29-13, PageID.817, 869-70, 886). It remains unclear whether this unit ever functioned properly.

On January 5, 2023, however, Kole mailed and emailed Defendant a letter identifying various continuing, unresolved issues with the equipment and seeking "termination of [the] contract under section 8(a)" because of "a material breach on Brink's part." (ECF No. 29-10, PageID.752-56; *see also* ECF No. 29-9). Notably, neither this letter nor any of the parties' communications between December 2022 and February 2023 identified an issue with Kole's initial authority to sign the Brink's Complete agreement or any other defect with the contract's enforceability. (*See* ECF Nos. 29-10, 29-11, 29-12). And Defendant had already entered into the December 27, 2022 contract with Loomis by the time Kole sent Plaintiff the letter. (*See* ECF No. 29-13, PageID.784-88, 820-21; *see also* ECF No. 46-3).

Both Kole and Randazzo testified that they decided in late December 2022 to "switch" from Brink's Complete to Loomis, the other cash management company, largely because of the unresolved issues with Plaintiff's equipment, leading Kole to send the January 2023 termination letter. (ECF No. 29-13, PageID.820-23, 829, 858-60, 866-69, 877, 882-83; ECF No. 29-14, PageID.931-33). Randazzo did not specifically recall reviewing Kole's termination letter before she sent it, and he denied having any discussions at the time over any preexisting contracts with Plaintiff or Brink's U.S., or whether the switch to Loomis would involve Defendant breaching any prior agreement. According to Randazzo, he simply directed Kole "to make the switch" because Defendant's business could not operate effectively with

Plaintiff's defective equipment. (ECF No. 29-14, PageID.951-54). Kole thought she "might have" mentioned the termination letter to Randazzo "in passing" before sending it, but she was uncertain. (ECF No. 29-13, PageID.825).

As an initial matter, the Court concludes that the issue of actual authority presents a factual dispute that cannot be resolved at this stage. On the one hand, the testimony of Defendant's various representatives is consistent that Kole was never explicitly or implicitly authorized to enter into the Brink's Complete contract, the owners were on board with Defendant's pricing but never saw or approved the final agreement before Kole signed, and she generally lacked signing authority unless explicitly approved in specific circumstances. And Kole in particular stated her belief that she only had the owners' approval of Defendant's pricing and thought her signature was simply to "move forward" with registration. Crediting this testimony, a reasonable fact finder could conclude that Kole lacked any "reasonable belie[f]" "that the principal wishe[d]" her to sign and bind Defendant to the Brink's Complete contract, i.e., to "tak[e the] action that has legal consequences for the principal." *Caribbean Sun Airlines Inc.*, 339 A.3d at 35.

At the same time, especially construing the facts in a light most favorable to Plaintiff, other evidence in the record circumstantially supports that Kole was generally authorized to enter contracts on Defendant's behalf, including the Brink's Complete agreement, and that the testimony and arguments otherwise essentially

amount to a post-textual rationalization to justify escaping the contract's obligations. Specifically, Kole was the signor for Defendant on each contract of which the Court is aware in this case, including the Loomis contract where Defendant's intent to be bound is undisputed. And the prior contract with Brink's U.S. was similarly signed by Defendant's prior controller, not Randazzo or any other owner.

More importantly, Randazzo knew the new safes were being installed in early December and communicated with Kole regularly throughout that month about the issues with the equipment and Kole's initial efforts to work with Defendant to remedy them (as well as her later efforts to switch to Loomis). Even accepting that Randazzo never saw the specific Brink's Complete contract, these circumstances support that he was at least aware of some agreement governing the installation and service of the new safes. Despite this, no one from Defendant ever raised any issue with Kole's authority at the time, nor until Plaintiff filed this action based on Defendant's alleged wrongful termination of the contract. Indeed, at least until Kole sought termination for Plaintiff's alleged failure to perform, both parties conducted themselves as if the Brink's Complete agreement that Kole signed was valid and enforceable.

Ultimately, where this issue largely depends on the credibility of Defendant's representatives, it is for a fact finder to decide. The Court therefore denies both parties' motions for summary judgment on the issue of actual authority.

In contrast, the Court concludes that the issue of apparent authority is sufficiently one-sided to warrant summary judgment in Plaintiff's favor. Importantly, Masotti, testifying for Plaintiff, stated his belief that Kole had authority to sign the Brink's Complete contract and bind Defendant accordingly. Consistent with the requirements of establishing apparent authority, the Court must therefore decide whether genuine factual disputes exist concerning (1) the reasonableness of this belief and (2) its traceability to some manifestation of Plaintiff, the principal.

First and foremost, "a corporate principal may make a manifestation to a third party concerning an agent's authority by placing the agent in charge of a transaction or situation." *Sarissa Capital Domestic Fund LP v. Innoviva, Inc.*, No. 2017-0309, 2017 Del. Ch. LEXIS 842, *39 (Del. Ch. Dec. 8, 2017) (cleaned up). "In particular, where a corporate principal has designated an agent as its exclusive channel of communication with a third party, that designation can constitute a manifestation of the corporation's assent to be bound in accordance with communications made through that channel." *Id.* (cleaned up).

Here, the record is undisputed that Kole acted as Defendant's exclusive point of contact with Plaintiff during the entirety of the parties' interactions in this case, and that she largely oversaw the dealings regarding safes and cash management at Defendant's stores. By designating Kole in this role, Defendant thus manifested an

intent to be bound by her actions, including Kole designating herself as the signatory for and ultimately signing the Brink's Complete agreement.

Accordingly, the Court rejects Defendant's argument to the extent it asserts the record is devoid of any manifestation of the principal as necessary to establish apparent authority. Rather, the Court concludes as a matter of law that Massotti's (i.e., Plaintiff's) belief in Kole's authority, whether or not reasonable, was fairly traceable to Defendant's conduct of placing Kole in the aforementioned role. And considering Kole's actions in this role, as well as the totality of circumstances of which Plaintiff knew, the Court similarly concludes as a matter of law that this belief was reasonable. *See Caribbean Sun Airlines Inc.*, 339 A.3d at 36 (although "apparent authority can never be derived from the acts of the agent alone," it involves "third party reliance on the acts of the principal *and* the agent") (emphasis added).

First, Kole's role as Defendant's sole employee overseeing cash management and handling communications regarding Plaintiff's services provided a reasonable basis for Plaintiff to believe that Kole was authorized to bind Defendant to an agreement covering these very topics. And at no point before, when, or even in the months after Kole signed the agreement did she or any other representative of Defendant indicate that Kole lacked the authority to do so. *See Sarissa Capital*, 2017 Del. Ch. LEXIS 842 at *39-40 (finding apparent authority under similar circumstances). In fact, even construing the facts in Defendant's favor, the earliest

Plaintiff could have known about Kole's purported lack of authority was in January 2023, after the new safes were installed and Kole sent the termination letter that plainly recognized the existence and enforceability of the Brink's Complete agreement.

Furthermore, the record here includes numerous other facts reinforcing the reasonableness of Plaintiff's belief that Kole had authority to bind Defendant. First, even accepting that the owners and Kole only meant to approve Plaintiff's pricing, Plaintiff was never made aware of this understanding. Kole's emails to Masotti only generally state that all the owners were on board with registering for the Brink's Complete service. Masotti then told Kole that "there is a registration process that needs to happen *to get your agreement*." (ECF No. 29-5, PageID.695-700 (emphasis added)). Kole completed this registration process, and in doing so she identified herself as Defendant's signatory and signed the contract. And Kole provided all the company information necessary to complete this registration.

Plaintiff also knew when Kole signed in this case that Defendant's prior controller signed the earlier agreement between Defendant and Brink's U.S, providing a reasonable basis to believe that Kole, as Defendant's new controller, was similarly authorized. To the extent the record viewed in Defendant's favor shows that Kole had less autonomy and no signing privileges as compared to the prior controller, this information was never relayed to Plaintiff at the time. Again, at no

point during this time, nor even in the months after the contract was signed, did Defendant ever raise the issue of Kole's authority to Plaintiff or any of its representatives.

Indeed, the only fact in the record known to Plaintiff around the time Kole signed that could possibly undermine finding apparent authority is that she identified Randazzo as Defendant's "control person" in the information she submitted to Plaintiff. But even with Randazzo as Defendant's sole control person, he still could have authorized Kole as Defendant's agent to enter into the Brink's Complete agreement. And given the aforementioned emails referencing the owners' general assent along with Kole's actions throughout the registration process, that is exactly how the situation appeared to Plaintiff. Randazzo's status as Defendant's control person, without Plaintiff knowing more, is merely neutral to whether Kole had apparent authority in this case. And apart from this neutral factor, all other circumstances of which Plaintiff knew provided reasonable bases to believe that Kole was so authorized.

As a final matter, the Court acknowledges that the issue of apparent authority is generally a question of fact under Delaware law. *See Caribbean Sun Airlines Inc.*, 339 A.3d at 34 ("Questions of apparent authority are questions of fact."); *Billops v. Magness Constr. Co.*, 391 A.2d 196, 199 ("Questions of apparent authority are questions of fact and are, therefore, for the jury to determine."). However, even this

caselaw indicates that the issue may be decided as a matter of law where no genuine dispute exists. *See Billops*, 391 A.2d at 199 ("While the evidence on behalf of appellants by no means amounts to a clear case of liability, we are of the opinion that reasonable persons could differ regarding whether or not the defendant franchisors cloaked the franchisee with apparent authority, or whether plaintiffs relied thereon. The issues must be determined after fuller development at trial.") (citation omitted). Here, for the reasons provided, the Court concludes that the facts are sufficiently one-sided that no reasonable fact finder could conclude apparent authority lacking.

In sum, viewing the facts of which Plaintiff was aware when Kole signed the Brink's Complete agreement, Plaintiff, and not Defendant, is entitled to summary judgment on the issue of apparent authority. With respect to this issue, the Court therefore grants Plaintiff's motion and denies Defendant's. And because a principal is bound by an agent acting with actual or apparent authority, the Court concludes as a matter of law that Kole's signature bound Defendant to the Brink's Complete agreement. The Court now turns to the related issue Defendant argues in response to Plaintiff's motion—whether this agreement is voidable due to fraudulent misrepresentation.[10]

[10] Regardless of whether the contract is voidable (or the viability of Defendant's other defenses), the Court will apply Delaware law to the remaining issues in this case because the agreement was valid and enforceable as a threshold matter.

### 2. Fraudulent Misrepresentation

Under Delaware law, a party must establish four elements "to prevail when asserting misrepresentation as a defense": "(1) that there was a misrepresentation; (2) that the misrepresentation was either fraudulent or material; (3) that the misrepresentation induced the recipient to enter into the contract; and (4) that the recipient's reliance on the misrepresentation was reasonable." *Alabi*, 583 A.2d 1358 at 1361-62.

Here, Masotti testified that he represented "the functionality" of the Brink's Complete product in his initial communications, including that "the Solution is new and improved versus what is traditionally out there." (ECF No. 28-7, PageID.505). The record includes an August 2022 email from Masotti to Kole stating in relevant part the following specific representations: (1) "[w]e have a new product . . . I think . . . might be a good fit for you"; (2) "I am certain you can save money based on this new cash solution compared to what you are doing now"; (3) "customer feedback . . . has been overwhelmingly positive"; (4) "[t]his streamlines your cash handling operations . . . [and] can reduce[] banking fees, change orders and the cost of cash"; (4) "[i]t also reduces the risk of internal and external theft"; and (5) "deposits that are placed throughout the day are deposited to your account via ACH [automated clearing house] the next business day to a bank of your choosing." (ECF No. 45-3, PageID.1583-84; *see also* ECF No. 28-7, PageID.506-12).

Masotti later told Kole that "[y]ou will get new equipment[] and you don't have a cost associated with getting the new solution." He also told Kole Plaintiff was solely responsible for all maintenance and repairs of the equipment. (ECF No. 45-3, PageID.1590). The record also includes a much earlier March 2021 email to Kole from a different Brink's employee that provided a brochure further describing the functions of and benefits to Defendant of enrolling in the Brink's Complete program. As particularly relevant, the brochure additionally provided that the product (1) "comes fully integrated out-of-the-box to . . . make cash fast, simple, and hassle-free to manage"; (2) would "reduce[] the amount of time spent handling cash," with cash collection handled exclusively by Plaintiff; and (3) is "[a] complete, turnkey solution that holistically addresses your need in every stage of the cash ecosystem." (ECF No. 45-3, PageID.1570-80).

According to Kole, she relied on these representations when she initially "switched" from the prior Brink's U.S. service to the new Brink's Complete product. In particular, she believed that (1) "we would receive daily credits for deposits into [the safes], . . . we would have a major cost savings and better cash flow, and . . . service to the machine[s] would occur, on average, [within] 24 to 48 hours after a case was opened"; and (2) Brink's Complete offered "new, state-of-the-art equipment." (ECF No. 29-13, PageID.814-16).

As stated, however, Kole, Randazzo, and Urbani all testified that there were immediate problems with Plaintiff's safes upon installation in December 2022. (ECF Nos. 29-13, PageID.816-17, 819-20, 843-54, 858-60, 866-77; 29-14, PageID.928, 931-32, 945-46, 954; 29-18, PageID.996-97, 1004-05, 1012; *see also* ECF Nos. 28-4, PageID.259-65; 28-9, PageID.550-51). And even Masotti acknowledged that Defendant "had some [legitimate] issues with the[] devices," and that a breakdown of equipment could cause a company using the safes serious issues. (ECF No. 28-7, PageID.504, 509). Construing the record in Defendant's favor, it essentially shows that both the two safes Plaintiff installed on December 7, 2022, stopped working within a matter of days, were not repaired until December 14, 2022, and again stopped working within another day or so.

As is particularly relevant, Kole testified "that [Plaintiff] did not provide us with the product that they stated" and that [t]he safes only worked for a few days." (ECF No. 29-13, PageID.858-60). She also said that the deficiencies in the Brink's Complete products and service forced her to drive large amounts of unsecured cash to the bank in her own vehicle "instead of Brink's taking it." (ECF No. 29-13, PageID.829-30; 846-50). Kole relatedly had issues with deposited funds not being properly credited to Defendant's bank in December 2022, though she said the money was later located and credited accordingly. (ECF No. 29-13, PageID.843-45; 852-53).

Construing this evidence in Defendant's favor, a reasonable fact finder could conclude that Defendant reasonably relied on Plaintiff's material misrepresentations that induced Defendant to switch to the Brink's Complete service. Specifically, Plaintiff in soliciting Defendant's business made numerous representations regarding efficiency, cost-savings, functionality, and performance, all essentially contrary to Defendant's ultimate experience with the Brink's Complete products and service as described by Defendant's witnesses. Plaintiff's motion for summary judgment is therefore denied to the extent that triable issues of fact exist concerning whether misrepresentations provide a defense to Plaintiff's breach of contract claim.

**B. Breach**

As stated, Plaintiff argues that there is no genuine dispute that Defendant failed to follow the process governing early termination in the parties' written agreement and committed a breach by not allowing Plaintiff to cure defective equipment before Defendant unilaterally terminated the agreement, thus triggering the contract's liquidated damages provision. Defendant, however, argues that (1) it substantially complied with contract's provisions and (2) there is no genuine dispute that Plaintiff committed the first material breach.

The relevant portions of the written agreement are as follows:

> **3.2 <u>ALTERATIONS REPAIR AND LOSS</u>**
>
> (a) Customer agrees that only Brink's or its Representatives shall service, repair or alter the Equipment in any way. During the

Equipment Term, Brink's shall repair the Equipment at no additional cost to Customer . . . . Repairs will be performed on Business Days.

(b) THE EQUIPMENT IS PROVIDED "AS IS." BRINK'S MAKES NO WARRANTY WITH RESPECT TO THE EQUIPMENT, WHETHER EXPRESS OR IMPLIED, AND DISCLAIMS ANY SUCH WARRANTIES, INCLUDING THAT THE EQUIPMENT IS NEW, MERCHANTABLE, OR FIT FOR A PARTICULAR PURPOSE.

* * *

8. **<u>TERMINATION</u>**

8.1 **<u>CUSTOMER TERMINATION</u>**

(a) Customer may terminate a particular Equipment Term in the event of a material breach by Brink's of this Agreement with respect to that Equipment; provided such breach continues for a period of thirty (30) days after Brink's receipt of written Notice[[11]] from Customer specifying the nature of such breach. If such breach is corrected within such Notice period, then such Equipment Term shall continue in full force and effect.

(b) If Customer terminates an Equipment Term within the first thirty (30) months of the applicable Equipment Term, other than for material breach by Brink's, Customer agrees to pay Brink's, as liquidated damages and not as a penalty, the remaining balance of Fees to be paid by Customer during the remaining portion of the applicable Equipment Term. . . . Customer shall also pay all Equipment removal and return costs and any prior Fees due to Brink's. . . .

---

[11] The agreement elsewhere specifies that "[a]ll 'Notices' under this Agreement shall be in writing and . . . shall be sent to the party at the address shown on the front of this Agreement or to such other address as either party may specify in writing." (ECF No. 29-6, PageID.715).

> (c) Any termination by Customer in accordance with this Section 8.1 shall have no effect on and shall not terminate any other Equipment Term hereunder nor any other existing agreement between Brink's and Customer.

(ECF No. 29-6, PageID.711, 713-14).

The agreement also provides: "Customer shall, during Customer's normal business hours, allow Brink's and its Representatives access to Service Locations and unimpeded access to Equipment to perform its obligations or exercise its rights hereunder." (ECF No. 29-6, PageID.711). As for Plaintiff's relevant duties, in addition to its obligations to install and service the equipment, it agreed to "initiate issuance of Direct Credit via ACH to Customer's specified account at Customer's Bank" once funds are deposited in a safe. (ECF No. 29-6, PageID.710). Concerning this service, the agreement further specifies that "Brink's sole obligation with respect to Direct Credit is to initiate issuance of credit via ACH to Customer's account at Customer's Bank in the amount of the Declared Value and, if applicable, to issue ACH credit or process ACH debits for Variances." (ECF No. 29-6, PageID.712). And the November 2, 2022 addendum to the Brink's Complete agreement obligates Plaintiff to provide Defendant check processing services. (ECF No. 29-7, PageID.723-25).

As an initial matter, setting aside for the moment the issues of substantial compliance and first material breach, the Court concludes as a matter of law that Defendant breached the explicit terms of the parties' agreement by unilaterally

terminating the contract without providing Plaintiff the opportunity to cure. The Court begins with the applicable facts.

As already discussed, Kole initially reached out to Plaintiff's representatives via email on December 9, 2022, requesting service for two safes installed at Defendant's stores and to postpone installation of safes at Defendant's two remaining stores given the outstanding problems. Technicians came to address the issues at both stores on December 14, 2022. (ECF No. 29-8, PageID.726-48). Kole's December 9, 2022 emails are as follows:

> Can I get an eta on when a person will be out to service the new safe? We are getting into a safety issue, with no where [sic] to drop our funds for the last two days. The weekend is a very busy time for us and if we do not have a safe that operates it will be a very dire situation. [Sent at 1:44 p.m.].
>
> * * *
>
> I am going to forward you my cell phone number [XXX-XXX]-1624. I am leaving for the day, but I need to know that the safe issue will be taken care of this evening. Also with the problem we are currently encountering with this safe, I am going to ask that we hold off on the installation of the new safes for our two busiest stores. . . . [Sent at 3:54 p.m.].
>
> * * *
>
> We now are having the same issues with our outer drive store #200. So we need to escalate and have a service call here too. [Sent at 4:49 p.m.].

(ECF No. 29-8, PageID.746-48).

On January 5, 2023, however, Kole mailed and emailed Defendant the letter identifying various continuing, unresolved issues with the equipment and seeking "termination of [the] contract under section 8(a)" because of "a material breach on Brink's part." The letter states that "termination is to be recognized on 1/6/2023," and that the alleged breaches "cannot be fixed within the 30-day window of this notification." (ECF No. 29-10, PageID.752-56; *see also* ECF No. 29-9). Notably, Kole at this point had already signed the Loomis contract on December 27, 2022. To reiterate, both Kole and Randazzo testified that they decided in late December 2022 to "switch" from Brink's Complete to Loomis, the other cash management company, largely because of the unresolved issues with Plaintiff's equipment, leading Kole to send the January 2023 termination letter. (ECF No. 29-13, PageID.820-23, 829, 858-60, 866-69, 877, 882-83; ECF No. 29-14, PageID.931-33). And Kole testified that Defendant stopped using Plaintiff's equipment from late December 2022 on, once it contracted with Loomis. (ECF No. 29-13, PageID.822-23).

Also on January 5, 2023, Masotti emailed Kole to express in relevant part that the contract gave Plaintiff 30 days to cure the purported breaches identified in the termination letter. (ECF No. 29-11, PageID.765-66). In the subsequent email chain, Kole initially emphasized that the safes "broke repeatedly" and "only really gave us a few days of operation," saying, "[W]e do not want the BrinksBox's[, s]o there

really is no item that can be cured[.]" (ECF No. 29-11, PageID.764). Masotti countered with an offer to discuss remedying the outstanding equipment issues, and he clarified as follows:

> [U]understand that with safes in the ground, if you are telling us not to fix them or state that there is no cure notice [and] you don't want the solution, and we terminate this contract, you are going to be hit with early termination fee's [sic], and those are expensive. This is why we have a cure notice period in the contract.

(ECF No. 29-11, PageID.762).

After some more back-and-forth concerning notice and Plaintiff's right to cure, during which Kole said that "the events that occurred during the time period of 12/7/22-1/5/23 . . . are too severe to cure," the parties in early- to mid-January 2023 seemingly agreed to allow Plaintiff an opportunity to cure by servicing the problematic equipment at one of Defendant's stores.[12] (ECF No. 29-11, PageID.758-61; ECF No. 29-12, PageID.773-76). Specifically, Masotti inquired about "proceeding on the cure notice as a follow up from our call on Friday," with an "action plan" to repair the equipment at store #200 that "is hinged on [Defendant]

---

[12] The record shows that the equipment at Defendant's store #600 was successfully repaired on December 28, 2022, whereas the equipment at store #200 remained inoperable through early 2023. (*See* ECF 29-12, PageID.769, 775; ECF No. 28-9, PageID.551; ECF No. 29-13, PageID.836-37; ECF 29-10, PageID.752-53). But Defendant had already decided to switch to Loomis and contracted for that replacement service by December 28, 2022, and it never tested or tried using the repaired equipment at store #600 after that date.

allowing our techs onsite to perform the work needed to repair the device." Kole responded as follows:

> I did speak to the owners (the main is still on vacation), and you can repair the Outer Drive safe [at store #200]. We will try to use them, but again I don't believe it will give us the service that we need.

(ECF No. 29-12, PageID.774-75). But when Masotti reached out on January 18, 2023, about sending a technician to the location, Kole demurred, saying that one of the owners wanted Plaintiff to hold off. Kole told Masotti, "I will get back to you after our legal team reviews." (ECF No. 29-11, PageID.773-74).

Masotti followed up on January 26 and 31, 2023, asking how Defendant wanted to proceed with repairs, and each time Kole said she should or hoped to have an answer the next day. (ECF No. 29-11, PageID.770-72). Masotti sent another email on February 3, 2023 (29 days after Kole sent the termination letter), reminding Kole of the requisite 30-day cure period, noting the earlier instruction to hold off on efforts to cure, and asking whether Plaintiff could assist Defendant in any way. (ECF No. 29-11, PageID.769).

Concerning this exchange and Plaintiff's efforts to cure following the January 5, 2023 termination letter, Kole testified that Urbani (Defendant's secretary and Randazzo's sister) told her to hold off on allowing Plaintiff to make the repairs. (ECF No. 29-13, PageID.840). Kole also acknowledged that Defendant never gave

Plaintiff permission to come out and make repairs at any point after January 5, 2023. (ECF No. 29-13, PageID.842-43).

Urbani confirmed telling Kole not to allow Plaintiff to come back and make repairs, and that Plaintiff was never able to make any repairs during January and February 2023 because of her instructions. (ECF No. 29-18, PageID.1006-07). According to Urbani, she was "shocked" when Kole informed her of Plaintiff's desire to come back for repairs because it had already tried 20 or more times to repair the equipment without success and the equipment essentially never worked properly from the day of installation. (ECF No. 29-18, PageID.1006). She therefore told Kole that the equipment was defective and unrepairable, suggesting that Plaintiff already had ample opportunity to remedy the issues. (ECF No. 29-18, PageID.1007).

On February 8, 2023, Defendant's counsel sent Plaintiff a notice "terminat[ing] the contract," which says Defendant was "forced to hire another company to provide timely cash management services" because Plaintiff was "notified in writing on numerous occasions to repair [the] unusable equipment" but failed to correct the problems. (ECF No. 29-16, PageID.983). The safes were ultimately removed at Defendant's request in March 2023 (*see* ECF No. 28-4, PageID.266).

Applying these facts to the relevant contract terms, in order for Defendant to terminate the agreement under § 8.1(a) without triggering the liquidated damages

provision, (1) Defendant had to provide written notice mailed to Plaintiff's address specifying the nature of Plaintiff's material breach(es), and (2) Plaintiff must have failed to correct the breach(es) within a 30-day notice/cure period. And Defendant was required to provide access to the locations and equipment during normal business hours so that Plaintiff could fulfil its obligation to make repairs and exercise its right to cure within 30 days to prevent termination.

Accepting that Kole's January 5, 2023 letter satisfied § 8.1(a)'s formal notice requirement, Defendant still could not terminate unless Plaintiff failed to cure the problems within 30 days. And even construing the evidence in Defendant's favor, it is clear that Defendant intended even before sending this notice to terminate the agreement and use Loomis instead, regardless of Plaintiff's right to cure.

The letter itself and Kole's subsequent emails with Masotti recognize Defendant's right to cure while seemingly trying to evade the provision by representing the problems as incurable. Most importantly, Kole continually led Plaintiff to believe in early 2023 that it would have an opportunity to repair the outstanding issues and prevent termination when she and the owners had already decided to switch to Loomis, stop using Plaintiff's equipment and service, and not provide Plaintiff further chances to make repairs. Indeed, the testimony of Defendant's witnesses is consistent that Defendant had no desire after January 5, 2023, to use Brink's Complete or allow Defendant's technicians back on site to

attempt further repairs. And though Defendant had already made this decision behind the scenes, it continued to lead Plaintiff on as the cure period ticked away. Ultimately, Defendant never allowed Plaintiff's technicians on site to even attempt any repairs during this time.

Accordingly, the Court concludes as a matter of law that Defendant breached the explicit terms of the parties' agreement by unilaterally terminating the contract without providing Plaintiff the opportunity to cure—specifically, by denying Plaintiff the post-notice access necessary to exercise its obligation to make repairs and its right to cure. The Court now turns to Defendant's defenses.

**1. Substantial Compliance**

Relying exclusively on *Vintage Rodeo Parent, LLC v. Rent-A-Center, Inc.*, No. 2018-0927, 2019 Del. Ch. LEXIS 87 (Del. Ch. Mar. 14, 2019), Defendant argues that summary judgment for Plaintiff is unwarranted because it substantially complied with the written contract's termination and notice provisions by giving Plaintiff more than 30 days to cure the equipment issues after Kole initially notified Plaintiff by email about problems with the safes on December 9, 2022. (ECF No. 45-1, PageID.1558-60).

*Vintage Rodeo* provides that "this Court has, at times, accepted substantial compliance with notice provisions in lieu of literal compliance, when the circumstances so justified." *Vintage Rodeo*, 2019 Del. Ch. LEXIS 87 at *43

(citations omitted). The Court observed that "[the] precedent on substantial compliance with notice provisions focuses almost entirely on the *manner* in which notice was provided [as opposed to the substance of notice]." *Id.* at *43-44 (emphasis in original). To support these contentions, the Court specifically relied on *Gildor v. Optical Solutions, Inc.*, No. 1416-N, 2006 Del. Ch. LEXIS 110 (Del. Ch. June 5, 2006), and *PR Acquisitions, LLC v. Midland Funding LLC*, No. 2017-0465-TMR, 2018 Del. Ch. LEXIS 137 (Del. Ch. Apr. 30, 2018). *Id.* at *43-44, nn. 192-94.

In *Gildor*, the Court stated as follows:

> When confronted with less than literal compliance with a notice provision, courts have required that a party substantially comply with the notice provision. The requirement of substantial compliance is an attempt to avoid harsh results where the purpose of these notice requirements has been met. When literal compliance is not possible, that is a sensible rule . . . . Substantial performance is that which, despite deviations from contract requirements, provides the important and essential benefits of the contract.

*Gildor*, 2006 Del. Ch. LEXIS 110 at *24-25 (cleaned up). The Court concluded that substantial compliance with a notice requirement was permitted because the contractual notice provision lacked an address for the recipient, making strict compliance impossible. *Id.* at *24-27.

In *PR Acquisitions*, the Court rejected the defendant's argument regarding substantial compliance in relevant part because the defendant (1) "d[id] not argue that compliance with the notice provision was impossible" and (2) "offer[ed] no reason other than its own error for its failure to comply with the notice provision."

*PR Acquisitions*, 2018 Del. Ch. LEXIS 137 at *18-21. And *Vintage Rodeo*, after noting that the plaintiffs argued for substantial compliance "in [both] the *manner* . . . [and] the *substance*" of notice, ultimately concluded that the parties were bound by the contract's explicit notice provisions. *Vintage Rodeo*, 2019 Del. Ch. LEXIS 87 at *44-47 (emphases in original).

Again, Defendant here argues that summary judgment for Plaintiff is unwarranted because it substantially complied with the with the written contract's termination and notice provisions by giving Plaintiff more than 30 days to cure the equipment issues after Kole initially notified Plaintiff by email about problems with the safes on December 9, 2022. The Court disagrees.

First, Defendant does not argue, nor does the record support, that strict compliance was impossible. Rather, Defendant had all the information necessary to strictly comply, including the address at which to send written notice, and it did ultimately provide a formal termination notice as contemplated by the contract, but only on January 5, 2023, one month after Kole's initial emails seeking help and after Defendant already decided to switch to Loomis.

Further, even if Kole's December 9, 2022 emails substantially complied with the manner of notice required by the contract, the emails' substance is fatal to Defendant's argument. Specifically, notice under § 8.1(a) must "specify[] the nature of [Plaintiff's material] breach." Upon such notice, Plaintiff then has 30 days to

cure. The December 2022 emails at issue, however (and in contrast to the later termination letter), never referenced § 8.1(a), any intent to terminate, or any breach of the agreement by Plaintiff (material or otherwise). Rather, the emails merely sought service for specific equipment issues, which Plaintiff was obligated to repair under the contract. Critically, nothing in these emails would have altered Plaintiff of any intent to terminate or that the 30-day cure period was beginning to run, which was the essential benefit for Plaintiff contemplated under the contract's notice provision.

The Court therefore concludes that the December 9, 2022 emails did not satisfy the essential purpose of the notice requirement—to alert Plaintiff to a customer's intention to terminate and start the clock concerning Plaintiff's right to cure—and rejects Defendant's claim of substantial compliance. And because the emails did not substantially comply with the applicable notice provision, the cure period could not have started until Defendant sent the formal termination letter on January 5, 2023. As already discussed, however, Defendant breached the parties' contract by unilaterally terminating the agreement without providing Plaintiff the opportunity to cure during the 30 days following issuance of the formal termination letter.

Lastly, to the extent Defendant argues that Plaintiff waived the requirement that notice be sent to a specific address given its "responsive action to diagnose and

fix the problems" (ECF No. 45-1, PageID.1560), the Court disagrees. Again, Plaintiff was obligated to make repairs under the contract, and nothing in the December 2022 emails at issue would have altered Plaintiff of any intent to terminate or that the 30-day cure period was beginning to run. Given these circumstances, the Court cannot conclude that Plaintiff ever *knowingly* or *voluntarily* waived any right with respect to § 8.1(a).

### 2. First Material Breach

Having concluded as a matter of law that Defendant breached the agreement and that it did not substantially comply with the provision regarding early termination, the Court turns to whether Plaintiff committed a first material breach.

"A party is excused from performance under a contract if the other party is in material breach thereof." *BioLife Solutions, Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003). "The converse of this principal is that a slight breach by one party, while giving rise to an action for damages, will not necessarily terminate the obligations of the injured party to perform under the contract." *Id.* "Non-performance by an injured party under such a circumstance operates as a breach of contract." *Id.* "The question whether the breach is of sufficient importance to justify non-performance by the non-breaching party is one of degree and is determined by weighing the consequences in the light of the actual custom of men in the performance of contracts similar to the one that is involved in the specific case." *Id.*

(cleaned up). In determining whether a failure to perform is material, courts should consider:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Id.* (quoting Restatement (Second) of Contracts § 241 (A.L.I. 1981)).

Defendant argues that Plaintiff committed the first material breach by providing defective equipment that essentially never worked, providing wholly inadequate customer service, failing to issue ACH credits to Defendant's bank for the cash deposited into the inoperable safes, failing to "properly install" check processing services, and failing to pick up funds from the older compusafes Defendant was still using at some stores.[13] According to Defendant, it obtained no benefit from Plaintiff's services and "[c]ould not possibly have any confidence in Brink's ability to perform the contract in the future." (ECF No. 45, PageID.1531;

[13] The Court agrees with Plaintiff that facts concerning the compusafes supplied pursuant to the old agreement with Brink's U.S. are completely irrelevant to whether either party breached the separate Brink's Complete agreement concerning the new safes at issue here.

ECF No. 45-1, PageID.1541-42, 1553-55, 1562-63; *see also* ECF No. 28-2, PageID.232-46).

Defendant relatedly argues that Plaintiff's complete failure to perform in this case amounts to a failure of consideration and warrants recission of the contract. *See Segovia v. Equities First Holdings, LLC*, No. 06C-09-149, 2008 Del. Super. LEXIS 197, at *81-83 (Del. Super. May 30, 2008) ("A party may terminate or rescind a contract because of substantial nonperformance or breach by the other party. Not all breaches will authorize the other party to abandon or refuse further performance. To justify termination it is necessary that the failure of performance on the part of the other go to the substance of the contract.") (cleaned up); *Innovation Ventures, LLC v. Liquid Mfg., LLC*, 499 Mich. 491, 509 (Mich. 2016) ("we have recognized a failure of consideration when one party has committed a first, substantial breach of a contract, and sought to maintain an action against the other party for a subsequent failure to perform"); *id.* at 510 ("When there is a failure to perform a substantial part of the contract or one of its essential items, the courts have permitted the parties to rescind the contract.") (cleaned up).[14]

[14] While the Court already determined as a threshold matter that the parties entered into a valid and enforceable contract under Delaware law, Defendant relies only on Michigan cases, including *Innovation Ventures*, with respect to this issue. Notably, the doctrines of first material breach and substantial breach/recission are substantively similar under Michigan and Delaware law. Accordingly, though Delaware law controls here, the Court will rely on Michigan law as necessary to address Defendant's argument and as potentially persuasive to the facts of this case.

Plaintiff counters that there could not have been any failure of consideration where the contract explicitly contemplated the possibility of a breach by requiring notice and the opportunity to cure before termination. According to Plaintiff, Defendant was bound (under Michigan or Delaware law) to follow the termination procedure even if Plaintiff was in material breach, and it failed to do so by unilaterally terminating the agreement without providing the requisite notice and opportunity to cure. (ECF No. 46, PageID.1665-70).

As an initial matter, the Court concludes as a matter of law that Plaintiff did not breach the parties' agreement(s) with respect to customer service or check processing. First, Defendant, citing to ¶ 9 of Kole's affidavit, argues that "Brink's customer service was wholly inadequate at resolving the many complaints lodged by Ms. Kole." (ECF No. 28-2, PageID.239). But Defendant's argument on this sub-issue spans just one sentence, is largely conclusory, and does not identify any specific terms or provisions concerning customer service that Plaintiff breached. (*See* ECF No. 28-2, PageID.239); *see also Everly v. Everly*, 958 F.3d 442, 448 n.6 (6th Cir. 2020) ("Issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed forfeited.") (cleaned up).

In any event, the relevant paragraph of Kole's affidavit merely states as follows:

> The equipment [at store #600] was fixed on 12/28/2022. At all times of inoperation at the store, the business operation was crippled with

> unreported monies trapped in Plaintiff['s] safes, no timely bank deposits resulting in overdrafts, employees['] safety at risk with the necessity of making several over $10,000 cash/check money deposits and reorganization of employees schedule to accommodate the breakdown and no check processing services as promised by Plaintiff.

(ECF No. 28-9, PageID.550-51). Given Kole's acknowledgment that this safe was ultimately fixed, the Court disagrees that Plaintiff's customer service was "wholly inadequate" to resolve her complaints. And to the extent Defendant seeks to inferentially malign the timeliness of Plaintiff's repair efforts and argue that Plaintiff breached its customer service obligations by leaving the equipment inoperable for a significant time, the contract did not require Plaintiff to respond to complaints or make repairs in any specific manner or within any specific timeline.

Rather, Plaintiff was generally obligated to repair the safes at no cost to Defendant, and to do so only on business days, but the contract lacks any requirement to attempt or complete repairs within any specified time, as well as any other additional obligations concerning customer service (like any particular level or quality of customer service bargained for). (*See* ECF 29-6). Therefore, even if the repairs Plaintiff attempted and made in this case were ineffective or temporary, it nevertheless repeatedly sent technicians throughout December 2022 to address Plaintiff's concerns in conformance with its service obligation, as stated by the agreement terms. For the foregoing reasons, the Cour concludes that Plaintiff did

not commit any breach with respect to customer service, let alone a material or substantial breach.

Concerning the November 2022 addendum for check processing services, Kole testified that Plaintiff needed more information and had not approved Defendant for check processing as of late December 2022, at which point Defendant decided to switch to Loomis. (ECF No. 29-13, PageID.827-29). Emails in the record show that an application for check processing—subject to review and approval by Plaintiff's third-party processor—was pending throughout November and December 2022. The application was initially submitted on November 17, 2022, with an expected review time of two business days, but Plaintiff (or, more accurately, the processor) needed further information to complete the review. Kole provided more documentation and the application was resubmitted numerous times, but Plaintiff's representative, as of December 19, 2022, was still seeking clarification from Kole concerning her submissions. (*See* ECF No. 46-3, PageID.1921-44).

The check-processing addendum obligated Plaintiff to "facilitate access to Check Processing services provided by [Plaintiff's] Third Party Processor for Check Declarations entered into Brink's 24SEVEN [system]." Critically, however, the terms also state, "Check Services are subject to Third Party Processor's 'Know Your Customer' approval." And "Check Services shall not commence until Customer has

entered into [a] Merchant Processing Agreement" with Plaintiff's "Third Party Processor." (ECF No. 29-7, PageID.723-24).

Considering the limited record regarding Plaintiff's provision (or lack thereof) of check processing services, the undisputed facts show that Plaintiff never received approval from the third-party processor before Defendant decided to switch to Loomis and Kole stopped following up on the issue. Given that this condition precedent was never met, Plaintiff never became obligated to move forward with providing the check processing service, and its failure to do so was not a breach, let alone a material or substantial breach. This conclusion is further supported given that Defendant's substantive argument on the sub-issue spans a single conclusory sentence without any reliance on specific facts in the record. (*See* ECF No. 28-2, PageID.239); *see also Everly v. Everly*, 958 F.3d 442, 448 n.6 (6th Cir. 2020) ("Issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed forfeited.") (cleaned up); *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) ("The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion *and identifying portions of the record* that demonstrate the absence of a genuine dispute over material facts.") (emphasis added); *Mount Elliott Cemetery Ass'n v. City of Troy*, 171 F.3d 398, 403 (6th Cir. 1999) ("The non-moving party, however, may not

rest on its pleadings, but *must come forward with evidence* from which a rational trier of fact could find in its favor.") (emphasis added).

The Court also rejects Defendant's argument based on Plaintiff providing defective equipment and failing to issue ACH credits to Defendant's bank for the cash deposited into the inoperable safes. First, while Kole testified to issues with deposited funds not being properly credited to Defendant's bank in December 2022, she admitted the money was later located and credited accordingly. (ECF No. 29-13, PageID.843-45; 852-53). Regarding the equipment itself, the record, if construed in Defendant's favor, essentially shows that both the two safes Plaintiff installed on December 7, 2022, stopped working within a matter of days, were not repaired until December 14, 2022, and again stopped working within another day or so.

Critically, however, even construing the evidence in Defendant's favor, it is clear that Defendant essentially intended by late December/early January 2022 to terminate the Brink's Complete agreement and use Loomis instead, regardless of Plaintiff's clear contractual right to cure any material breach. And Defendant never allowed Plaintiff's technicians on site to even attempt any repairs despite Plaintiff's continuing right to cure at the time. The record is therefore sufficiently one-sided to conclude as a matter of law that Defendant deliberately ignored the notice and cure requirements. Stated differently, Defendant denied Plaintiff post-notice access to the equipment (1) with the specific intent to manufacture a basis for early termination

and (2) after it already made a final decision to stop using the Brink's Complete service.

Given this key circumstance, the Court rejects Defendant's remaining claims of first material/substantial breach. First, *Innovation Ventures*, one of the Michigan cases Defendant cites in support of rescission or excusing its performance obligation to give the opportunity to cure, actually favors Plaintiff in this case. *Innovation Ventures* states that "failure of consideration does not void a contract when the party seeks to void the contract based on an event explicitly anticipated in the contract." *Innovation Ventures*, 499 Mich. at 510. The contract at issue "contemplated the termination of the Agreement with 14 days' notice, at any time, without cause," and the Michigan Supreme Court concluded as follows:

> A party seeking to void a contract on the basis of an event anticipated by the contract cannot claim failure of consideration. Because the plaintiff acted within the rights explicitly provided by the contract, the defendants may not now claim failure of consideration.

*Id.* at 511 (citation omitted). Likewise here, the Brink's Complete agreement explicitly anticipated that Plaintiff may commit a (first) material breach and still required that Defendant provide notice and the opportunity to cure before terminating any equipment term.

More importantly, Delaware courts "have recognized that contractual notice and cure provisions cannot be ignored." *Bold St. Peters, L.P. v. Bold on Blvd. LLC*, No. 2024-0653, 2024 Del. Ch. LEXIS 364, at *12 (Del. Ch. Nov. 19, 2024) (cleaned

up). "Delaware law requires compliance with notice and cure provisions." *Id.* And "[u]nder Delaware law, sophisticated parties are bound by the terms of their agreement." *Glaxo Grp. Ltd. v. Drit LP*, 248 A.3d 911, 919 (Del. 2021). "Even if the bargain they strike ends up a bad deal for one or both parties, the court's role is to enforce the agreement as written." *Id.*; *see also Band's Visit Nat'l Tour LLC v. Hartford Fire Ins. Co.*, 307 A.3d 387, 423 (Del. Super. 2023) ("Delaware courts cannot rewrite a contract to appease a party who later wishes a better deal had been struck") (citation omitted). "As we have explained, parties have a right to enter into good and bad contracts, the law enforces both." *Glaxo*, 248 A.3d at 919 (cleaned up). "Holding sophisticated contracting parties to their agreement promotes certainty and predictability in commercial transactions." *Id.*

As stated, the record shows as a matter of law that Defendant deliberately ignored the notice and cure requirements that were contracted for in the parties' agreement. And given the cure provision, the contract also explicitly contemplated that a material breach by Plaintiff would *not* automatically void the agreement or excuse Defendant's performance. Further, per Delaware law, Defendant should not be able to escape compliance with the contract's requirements even if it signed up for a bad deal (i.e., even if providing the requisite access and opportunity to cure in January and February 2023 would not have resolved the equipment issues and merely increased Defendant's damages). Accordingly, the Court concludes that

excusing Defendant's breach based on any prior material breach by Plaintiff would, contrary to Delaware law, (1) essentially require the Court to rewrite the agreement terms and (2) permit Defendant to deliberately ignore the contract's notice and cure provisions.

For the foregoing reasons, the Court rejects Defendant's first material breach defense as a matter of law. The Court now turns to Defendant's argument concerning liquidated damages.

**C. Liquidated Damages**

"In Delaware, a liquidated damages provision is valid and enforceable when it reflects the parties' best estimate of unascertainable damages and is not a penalty." *Caruso v. Barton*, 341 A.3d 472; 2025 Del. LEXIS 161, at *8 (Del. 2025) (unpublished table decision). "By contrast, a penalty is an agreement to pay a stipulated sum upon breach, irrespective of the damage sustained." *Id.* at *8-9 (cleaned up). "A liquidated damages provision will not be disturbed when (1) damages are uncertain, and (2) the amount agreed upon is reasonable based on the anticipated loss and difficulty of calculating that loss." *Id.* at *9.

"The reasonableness of liquidated damages is assessed at the time of contracting and not at the time of breach." *Id.* Liquidated damages are presumed valid, and the party contesting such provisions bear the burden of proof to show

otherwise. *Smart Sand, Inc. v. US Well Servs. LLC*, No. N19C-01-144, 2021 Del. Super. LEXIS 471, at *16 (Del. Super. June 1, 2021); *see also id.* at *14, 14 n. 70.

"The validity of a liquidated damages provision involves a review of the intent of the parties to the contract." *Del. Bay Surgical Servs., P.A. v. Swier*, 900 A.2d 646, 650 (Del. 2006). "Determining the intent of the parties is a question of fact." *Id.* Concerning the two-prong test identified above:

> To be a valid liquidated damages provision under the first prong of the test, the damages that would result from a breach . . . must be uncertain or incapable of accurate calculation.
>
> *　　　*　　　*
>
> To fail the second prong . . . , the amount at issue must be unconscionable or not rationally related to any measure of damages a party might conceivably sustain.

*Id.* at 651 (citations omitted; cleaned up).

As stated, the contract in this case provides the following liquidated damages provision:

> If Customer terminates an Equipment Term within the first thirty (30) months of the applicable Equipment Term, other than for material breach by Brink's, Customer agrees to pay Brink's, as liquidated damages and not as a penalty, the remaining balance of Fees to be paid by Customer during the remaining portion of the applicable Equipment Term. . . . Customer shall also pay all Equipment removal and return costs and any prior Fees due to Brink's. . . .

(ECF No. 29-6, PageID.713-14). At the time of contracting, the parties agreed to an initial five-year Equipment Term with monthly subscription fees of $884.16. (ECF

No. 29-6, PageID.710-11, 716). So the subscription fees contemplated over the entire term total $53,049.60. The liquidated damages provision essentially provides for a termination fee at 100% of the contract price, plus reimbursement for the cost to remove and return the equipment.

Defendant argues that the liquidated damages provision is unenforceable under Delaware law because damages are not uncertain and the liquidated damages amount is unreasonable. (ECF No. 45, PageID.1530; ECF No. 45-1, PageID.1549-52). Defendant first asserts damages are not uncertain "because the contract paperwork calls for a specific monthly fees [sic] for the services Plaintiff provided" and "[t]hese fees can be computed with reasonable certainty for the entire five-year term which Plaintiff seeks to enforce." Defendant relatedly argues that "the costs Plaintiff saves by not having to perform" are capable of accurate calculation because "Plaintiff must have knowledge of the lease payments it will save over the next five years" and "knows how many times it will have to pick up the safes on a weekly, monthly or annual basis." (ECF No. 45-1, PageID.1549).

Next, Defendant argues that Plaintiff's claimed amount of liquidated damages is unreasonable "because it gives Plaintiff all the revenues it would be entitled to under the five-year contract, without deduction for the cost it saves by not having to perform. This is not reflective of actual damages." (ECF No. 45-1, PageID.1550-51). Relying on *Brazen v. Bell Atlantic Corp.*, 695 A.2d 43 (Del. 1997), Defendant

compares the 100%-plus termination fee at issue here to the 2-3% range purportedly deemed reasonable under Delaware law. Defendant relatedly asserts that the contract's liquidated damages provision acts as a penalty "because Defendant still has to go out and pay another service provider full price to obtain cash services for the full five years," and Defendant essentially claims that Plaintiff would receive a windfall if the provision were enforced.

Plaintiff counters that Defendant cites no evidence to support its argument and, in any event, waived the defense by raising it for the first time in its response to Plaintiff's motion for summary judgment. Plaintiff also argues that *Brazen* does not warrant finding the liquidated damages provision here unreasonable. (ECF No. 48, PageID.2011-14). The Court agrees on all three points.

First, various courts have determined that the unenforceability of liquidated damages is an affirmative defense that is waived unless properly raised in a responsive pleading. *See, e.g., Pace Communs., Inc. v. Moonlight Design, Inc.*, 31 F.3d 587, 594 (7th Cir. 1994) (holding that party asserting penalty clause defense has burden of pleading and persuasion); *In re Snelson*, 305 B.R. 255, 262 (Bankr. N.D. Tex. 2003) (holding that assertion that liquidated damages clause was an unenforceable penalty is an affirmative defense which is waived if not raised in a responsive pleading); *Public Health Trust of Dade Cnty. v. Romart Constr., Inc.*, 577 So.2d 636, 638 (Fla. Ct. App. 1991) (same); *RLM Props., Ltd. v. Brammer*, No. 2014-

CA-6, 2014 Ohio App. LEXIS 3451, at *11 (Oh. Ct. App. Aug. 15, 2014) (same); *see also Horton v. Potter*, 369 F.3d 906, 911 (6th Cir. 2004) ("Failure to plead an affirmative defense in the first responsive pleading to a complaint generally results in a waiver of that defense.").[15]

In the Sixth Circuit, however, "[a] defendant does not waive an affirmative defense if the defense is raised at a time when [the] plaintiff's ability to respond is not prejudiced." *R.H. Cochran & Assocs. v. Sheet Metal Workers Int'l Ass'n Local Union No. 33*, 335 Fed. App'x 516, 519 (6th Cir. 2009) (unpublished); *see also Rogers v. IRS*, 822 F.3d 854, 856 (6th Cir. 2016) ("A district court may, in its discretion, allow a defendant to raise an affirmative defense for the first time in a motion for summary judgment if doing so does not result in surprise or prejudice to the plaintiff.").

Critically, Plaintiff argues that consideration of Defendant's argument would be prejudicial since it was raised for the first time in Defendant's response to Plaintiff's motion for summary judgment, *after the close of fact discovery*. The Court agrees. To appropriately counter Defendant's argument concerning liquidated

[15] "The reason why affirmative defenses under Rule 8(c) must be pled in the answer is to give the opposing party notice of the defense and a chance to develop evidence and offer arguments to controvert the defense." *Glowacki v. O'Reilly Auto Enters., LLC*, No. 21-868, 2023 U.S Dist. LEXIS 22529, at *24-25 (W.D. Mich. Dec. 14, 2023) (quoting *Knapp Shoes, Inc. v. Sylvania Show Mfg. Corp.*, 15 F.3d 1222, 1226 (1st Cir. 1994)).

damages at this stage, Plaintiff would need record evidence concerning the key issues of whether (1) damages are uncertain and (2) the contract's liquidated damages amount is unconscionable.

However, with the liquidated damages issue not being raised until after discovery closed, Plaintiff was deprived notice and the opportunity to develop the record in this regard. This is especially prejudicial since the record essentially lacks any evidence specific to the parties' intent as to liquidated damages at the time of contracting. The Court therefore deems Defendant's argument concerning liquidated damages waived.

Next, even if this argument is not waived, the Court concludes that Defendant fails to meet its burden at this stage to present specific evidence overcoming the presumed validity of the contract's liquidated damages provision. *See Mount Elliott Cemetery Ass'n*, 171 F.3d at 403 (6th Cir. 1999) ("The non-moving party, however, may not rest on its pleadings, but must come forward with evidence from which a rational trier of fact could find in its favor."); *Smart Sand*, 2021 Del. Super. LEXIS 471 at *16 (liquidated damages are presumed valid, and the party contesting such provisions bear the burden of proof to show otherwise); *contra Hemlock Semiconductor Operations, LLC v. SolarWorld Indus. Sachsen GmbH*, 867 F.3d 692, 706-07 (6th Cir. 2017) (rejecting district court's partial basis in upholding validity of liquidated damages at the summary judgment stage because the defendant "did

point to evidence in the record . . . in support of its argument that the liquidated-damages award is unconscionable.").

Critically, and likely at least in part due to its own failure in raising the issue after discovery closed, Defendant essentially cites no facts from the record to support its contentions that damages are not uncertain and that the liquidated damages amount at issue is unreasonable. *See Thermo v. BesTop, Inc.*, No. 16-13456, 2019 U.S. Dist. LEXIS 115848, at *15-16 (E.D. Mich. July 12, 2019) ("BesTop offers only attorney argument which is plainly insufficient to create a genuine issue of material fact for trial."); *Perfect Web Technologies, Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1332 (Fed. Cir. 2009) ("[M]ere[] attorney argument lacking evidentiary support" is not evidence.). And Defendant's argument substantively neglects to address critical factual gaps that preclude overcoming the presumed validity of liquidated damages in this case.

For example, even if Plaintiff's potential lost revenue in subscription fees in the event of early termination was readily calculable, the lost-profit damages from such breach would also have to account for those expenses Plaintiff saved by not having to perform cash management services over the remaining contract term, as well as other incidental expenses incurred by the breach, such as the expected costs that would be required to find another customer to lease the equipment and to repurpose the equipment for such customer's needs. And the ability to estimate these

latter amounts at the time of contracting importantly depended on the likelihood and difficulty of finding a replacement customer to sublease the equipment within the remainder of the equipment term abandoned by the breaching customer.

The record, however, is largely silent or else undeveloped as to such other costs Plaintiff purportedly incurred by Defendant's early termination in this case, let alone what could have been accurately estimated at the time of contracting. In fact, the scant record available on this issue supports that setting up Defendant or any other customer with the Brink's Complete service involves unique expenses that would *not* be readily calculable at the time of contracting.

Specifically, Plaintiff's Vice President of Revenue states in a declaration that: (1) "to provide the *Brink's Complete* services, Brink's must install at least one expensive, proprietary safe at each service location"; (2) "Brink's incurs other, additional up-front labor and costs when setting up services beyond leasing or procuring and installing its safes. For example, Brink's must complete extensive 'Know Your Customer' procedures before it can begin providing services . . ."; and (3) "Each safe [installed for Defendant] had been leased by Brink's and was equipped with specialized equipment installed on it to allow Brink's to provide Randazzo's with the services detailed herein." (ECF No. 29-15, PageID.980). These types of large, upfront costs support the validity of the contract's liquidated damages provision. *See Hemlock Semiconductor*, 867 F.3d at 708 (liquidated damages not an

unenforceable penalty in part because the amount accounted for significant expansion costs required by the plaintiff to satisfy its obligations).

To the extent Defendant argues that Plaintiff knows how much it would save via lease payments for the equipment Plaintiff would no longer incur, nothing in the record shows that Plaintiff saved or would have expected to save on such costs in this case. Plaintiff itself leases the equipment at issue, yes, and essentially sublet the safes for Defendant's limited use in this case, but there are no facts showing that Plaintiff could return the equipment or otherwise get reimbursed for its own lease expenses in the event one of Plaintiff's customers breached and/or the equipment was no longer in use. And even if certain consistent weekly, monthly, or annual expenses saved from an early termination were capable of accurate calculation at the time of contracting, Defendant completely fails to address variable expenses like those for as-needed customer support and repairs that certainly would be difficult to estimate at the outset of a five-year contract. For these reasons, the Court cannot conclude that damages resulting from an early termination were capable of accurate calculation at the time of contracting.

Relatedly, the Court cannot conclude that the liquidated damages amount at issue here is unconscionable (i.e., not rationally related to *any* measure of damages Plaintiff might conceivably sustain due to early termination). Though Plaintiff will save something by not having to perform cash management services over the

remaining contract term, Defendant does not address other incidental expenses incurred by the breach (like expected costs that would be required to find another customer to lease the equipment and to repurpose the equipment for such customer's needs). Nor does Defendant address the likelihood and difficulty of Plaintiff finding a replacement customer to sublease the equipment within the remainder of the equipment term. The record, importantly, includes no facts showing what specific expenses Plaintiff either saved in this case by not having to perform or incurred (if applicable) in having to market, tailor, and provide the safes for a new customer. Nor do the facts support that such additional expenses incurred by early termination were or could conceivably amount to less than Plaintiff's savings by not having to perform. The record thus lacks support for Defendant's argument that Plaintiff has received a windfall in this case.

Next, Defendant's reliance on *Brazen* is unavailing. That case involved a merger agreement's reciprocal termination fee of $550 million that triggered if a merger did not occur. *Brazen* 695 A.2d at 45-46. In upholding the termination fee as a reasonable and valid liquidated damages provision, the Court reasoned in part that "the $ 550 million fee represents 2% of Bell Atlantic's market capitalization of $ 28 billion[, and t]his percentage falls well within the range of termination fees upheld as reasonable by the courts of this State." *Id.* at 49. Importantly, *Brazen* and the cases it cited for the above premise all involved termination fees imposed in the

context of failed mergers and acquisitions, not pursuant to a term contract for equipment and services like that here. The Court therefore concludes that the percentages deemed reasonable in these cases do not provide any categorical bar against Plaintiff recovering 100% of the contract price here. *See also Hemlock Semiconductor*, 867 F.3d at 705-08 (upholding liquidated damage award of "the full amount of the contract price" and rejecting argument that the plaintiff received a windfall).

Further, *Brazen* states that "the greater the difficulty [of calculating loss], the easier it is to show that the amount fixed was reasonable." *Id.* at 48. "In fact, where the level of uncertainty surrounding a given transaction is high, experience has shown that the award of a court or jury is no more likely to be exact compensation than is the advance estimate of the parties themselves." *Id.* (cleaned up). Again, Defendant completely fails to address Plaintiff's variable expenses that certainly would be difficult to estimate at the outset of a five-year contract, other similarly-uncertain incidental expenses incurred by a breach, or the likelihood and difficulty of Plaintiff finding a replacement customer to sublease the equipment within the remainder of the equipment term. Given the practical difficulty in estimating at the time of contracting various aspects of the damage anticipated by early termination, and for the reasons already discussed above, the Court cannot conclude that the

liquidated damages amount here is not rationally related to *any* measure of damages Plaintiff might conceivably sustain.

In sum, the Court concludes that Defendant waived its challenge to the liquidated damages provision by raising it after the close of discovery, which prejudiced Plaintiff's opportunity to develop the record and respond accordingly. And even considering Defendant's argument and the applicable factual record, the Court concludes that Defendant fails to meet its burden to overcome the presumed validity of the provision. Having rejected Defendant's challenge to the liquidated damages provision and because the provision clearly applies to Defendant's breach in this case, the Court concludes that Plaintiff has established an unrebutted prima facie case with respect to the element of damages.

## IV. Conclusion

In conclusion, the Court concludes as a matter of law that Defendant (1) is bound by the Brink's Complete contract and (2) breached the contract's terms by unilaterally terminating the contract without providing Plaintiff the opportunity to cure. The Court also rejects Defendant's defenses with respect to substantial compliance, first material breach, and liquidated damages. And having rejected Defendant's challenge to the liquidated damages provision, the Court concludes that Plaintiff has established an unrebutted prima facie case with respect to the element of damages. In contrast, the Court concludes that a genuine factual dispute exists

concerning whether the contract is voidable due to material misrepresentations that induced Defendant to enter into the agreement.

* * *

For the reasons given, the Court ORDERS that Plaintiff's motion for summary judgment (ECF No. 29) is GRANTED IN PART AND DENIED IN PART**.**

IT IS FURTHER ORDERED that Defendant's motion for summary judgment (ECF No. 28) is DENIED**.**

IT IS FURTHER ORDERED that Plaintiff's motion in limine (ECF No. 51) is DENIED WITHOUT PREJUDICE as moot.

Dated: November 4, 2026

s/Robert J. White
Robert J. White
United States District Judge